EVERETT H. O'DOWD and CORNELIA N. O'DOWD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent ROBINSON WATER COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
O'Dowd v. Commissioner
Docket Nos. 5634-73, 5635-73.
United States Tax Court
T.C. Memo 1976-168; 1976 Tax Ct. Memo LEXIS 229; 35 T.C.M. (CCH) 754; T.C.M. (RIA) 760168; May 27, 1976, Filed John Lock, for the petitioners. James N. Mullen, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the Federal income tax of petitioners Everett H. O'Dowd and Cornelia N. O'Dowd for the calendar year 1969 in the amount of $153,853.90 and determined a deficiency in Federal income tax of Robinson Water Company for the calendar year 1969 in the amount of $21,248.43. In an amended petition the O'Dowds claimed an overpayment of income tax for the year 1969 in the amount of $1,028.02 and in an amended petition Robinson Water Company claimed an overpayment of income tax for 1969 of $3,564.81. In his answer to the amended petition of Robinson Water Company respondent claimed an increased deficiency for the calendar year 1969 in the amount of $4,501.65, making the total deficiency in issue for Robinson Water Company for the year 1969 the amount *233 of $25,750.08. The issues for decision are (1) Whether petitioners Everett H. and Cornelia N. O'Dowd realized any taxable gain on the termination of the status of Robinson Water Company of being taxable as a corporation under section 1361, I.R.C. 1954, [1] and, if so, the amount of the gain so realized; and (2) whether Robinson Water Company realized ordinary income in the amount of $66,363.12 on the termination of its status of being taxable under section 1361 from the disposition of depreciable property under section 1245. In determining whether the O'Dowds realized a gain upon termination of section 1361 status of Robinson Water Company, it is necessary to decide (a) whether an effective election to be taxed under section 1361 was made on behalf of Robinson Water Company, (b) whether if the attempted election was defective petitioners are estopped to deny the validity of the election, and (c) if it is determined that a proper election was made, whether the termination of that election by act of Congress is properly to be considered to result in a distribution to *234 the O'Dowds in the nature of a distribution in liquidation of a corporation. Respondent also determined the basis for computing depreciation on the assets of Robinson Water Company in the hands of the O'Dowds on the basis that the O'Dowds received the assets as a distribution in liquidation of a corporation and that, therefore, the fair market value of the assets at the date of distribution is the proper basis of the assets for depreciation. Respondent also determined that the assets had a useful life of 15 years. Petitioners have not contested respondent's determination of useful life and agree that if respondent is correct in his determination that the O'Dowds received a distribution in the nature of a distribution upon liquidation of a corporation upon the termination of a section 1361 election for Robinson Water Company, then the basis of the assets in their hands is the fair market value of the depreciable assets determined for the purpose of determining the amount of gain realized by the O'Dowds upon the distribution to them of the assets of the water company. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Everett H. *235 and Cornelia N. O'Dowd, are husband and wife, whose legal residence at the time the petition in their case was filed was Waco, Texas. Robinson Water Company at the time its petition in this case was filed, was an unincorporated business which was being operated in Robinson, Texas by Everett H. O'Dowd and Cornelia N. O'Dowd whose legal residence was in Waco, Texas. Robinson, Texas is a small community that borders on Waco, Texas. The O'Dowds, who were married in 1937, moved to Robinson in 1940 at a time when the population of Robinson was 150 people. Mr. and Mrs. O'Dowd filed joint Federal income tax returns on the cash basis of accounting for the calendar years 1961 through 1969 with the District Director of Internal Revenue, Austin, Texas. Although Robinson Water Company has never been incorporated under the laws of the State of Texas, it filed corporate income tax returns (Form 1120) on the basis of a document Mr. O'Dowd considered to be an election to have it taxed as a corporation under section 1361 for the calendar years 1961 through 1969 and was taxed for those years as a corporation. In 1952 Robinson suffered a severe drought. Mr. and Mrs. O'Dowd contracted to have *236 an artesian well dug on their 10-acre property to supply them with water. When their well was completed, neighbors in the surrounding area in Robinson asked that they be permitted to tie into this artesian well. This led eventually to Mr. O'Dowd agreeing to run water lines to serve approximately 72 of his neighbors and thereby starting the operation of a water system under the name of Robinson Water Company. At that time, Robinson was not incorporated. The water system (hereinafter referred to as Robinson Water) began its operation in 1952 with one well and one pump station. From 1952 until 1969, Robinson Water added additional wells and pump stations.In 1954 while Mr. O'Dowd was mayor of Robinson, the town was incorporated. Gradually during the years the population of Robinson increased and additions were made to the water system to serve the new customers. As of January 1, 1969, Robinson had a population of approximately 2,100 people and Robinson Water was serving approximately 1,000 customers. In 1967 Robinson acquired a public sewer facility primarily because of the efforts of Mr. O'Dowd and also in the '60s, through Mr. O'Dowd's efforts, organized a neighborhood volunteer *237 fire department. However, Robinson has always been and essentially is still a farming community where cattle, sheep and other livestock are grazed within the city limits. Mr. O'Dowd is a practcing attorney with offices in Robinson, a director of the Robinson bank, and has done work as a contractor in installing water systems for other small cities. He has supervised the installation of the additions to the Robinson Water pipelines, pumping stations, tanks and other facilities. Mr. O'Dowd holds a Class A water certificate issued by the State of Texas evidencing proficiency as a water utility operator. Mr. O'Dowd is also a wholesale distributor of various types of municipal equipment and served for 14 years as mayor of Robinson. From 1959 through 1969, 70 percent of Robinson Water was owned by Mr. and Mrs. O'Dowd as community property. Their daughter, Cornelia Ann Burney, was the nonparticipating owner of the remaining 30 percent interest in Robinson Water. Mrs. Burney as a nonparticipating owner does not share in the profits of Robinson Water. Mr. O'Dowd is the trustee for his daughter's interest in Robinson Water with full power to manage, operate and control, mortgage or *238 sell her interest provided in the event of sale 30 percent of the net proceeds are required to be placed in a trust fund solely for the use and benefit of Cornelia Ann Burney.
Since the formation of Robinson Water, Mr. and Mrs. O'Dowd have both participated in its operation. Mr. O'Dowd has manged the operations and made the decisions with respect to the additions to be made to the system, as well as the other managerial decisions concerning the company's operation. He received a salary of $5,000 from Robinson Water for each of the years 1961 and 1962, a salary of $6,500 for each of the years 1963 and 1964, and a salary of $10,000 for each of the years 1965 through 1968. On the O'Dowds' joint income tax returns for each of the years 1962 through 1968 salary from Robinson Water was reported in the respective amounts above set forth. Mrs. O'Dowd kept the books of Robinson Water with occasional help from a clerical employee and prepared various State and Federal government reports. She turned these books over to the Certified Public Accountant who was retained by Mr. O'Dowd for preparation of financial statements and income tax returns. She also drew and signed the checks of Robinson *239 Water in payment of its operating and other expenses. Although Mrs. O'Dowd generally would spend an average of 5 to 6 hours a day in connection with her work for Robinson Water, she has never drawn a salary from Robinson Water. Robinson Water was granted a franchise by the City of Robinson in 1955, entitling it to use of street right-of-ways. The franchise is for a period of 50 years and is not exclusive. Under the franchise Robinson Water is required to provide persons within the city with water meeting the qualifications of the laws of the State of Texas. On February 15, 1962, Mr. O'Dowd sent the following letter to the District Director of Internal Revenue: Director of Internal Revenue Federal Building Austin, Texas: Gentlemen: In Re: Robinson Water Company We elect to have our income tax for the water company tax as a corporation. We hereby make the election for the tax year ending 12-31-61. The business meets the qualifications of a 1361 corporation, under the revenue laws. It is not personal service business, capital is a material income producing factor, No proprietor or partner has more than a 10% interest in another 1361 corporation, no proprietor or partner *240 is a nonresident alien, the business is solely owned by Everett H. O'Dowd and wife. We agree to notify the District Director if a change of ownership occurs, or if the enterprise becomes a corporation. If this information is not sufficient to meet your requirements for an election, will you please forward to us what ever forms you required to be executed in order that we may be classified as a 1361 corporation under the revenue laws. Very truly yours, /s/ Everett H. O'Dowd This letter is the only document sent to the Internal Revenue Service by Mr. O'Dowd attempting to elect for Robinson Water to be taxed as a corporation under section 1361. Neither Mrs. O'Dowd nor Cornelia Ann Burney signed any document purporting to elect for Robinson Water to be taxed under section 1361. Mr. O'Dowd did not discuss the letter of election to have Robinson Water taxed under section 1361 with Mrs. O'Dowd since he did not believe she would understand his explanation of this election. Mrs. O'Dowd relied on her husband in connection with business decisions since he was an attorney and in her opinion was a capable business man. On the corporate tax returns (Form 1120) filed by Robinson Water *241 for the years 1962 through 1968 a check was placed in the box indicating that Robinson Water was a "sole proprietorship * * * electing under section 1361 to be taxed as a corporation." The corporate return of Robinson Water (Form 1120) for the year 1969 had typed at the top of page 1 "FINAL (SEC. 1361 - CORPORATION)." Each of the returns of Robinson Water was signed by Mr. O'Dowd as "owneroperator." Each return indicated that it was prepared by a Certified Public Accountant. The 1967 return has a stamp on the top of page 1 reading "CLOSED ON SURVEY." Neither Mr. nor Mrs. O'Dowd nor Robinson Water received any specific notification from the Internal Revenue Service that their election for Robinson Water to be taxed under section 1361 had been accepted or any additional information or forms with respect to this election other than blank copies of corporate income tax returns addressed to Robinson Water with the address sticker showing the Employer Indentification Number of Robinson Water. When it became necessary in 1964 for persons operating under an assumed name in Texas to register that assumed name with the State, Mr. O'Dowd filed the following certificate in compliance with *242 this requirement: STATE OF TEXAS ASSUMED NAME BUSINESS PURPOSES COUNTY OF MC LENNAN
I, EVERETT H O'DOWD, do hereby certify that I conduct and transact, and intend to conduct and transact, business at Robinson in, Mc Lennan County, Texas, known as Robinson Water Company doing business as corporation under section 1361 of Internal Revenue Code and amendments thereto; that the true and full name of each person conducting and transacting the same is: Everett H O'Dowd, 101 West Shamrock Drive, Robinson, Texas Cornelia N. O'Dowd, 101 West Shamrock Drive, Robinson, Texas Cornelia Ann O'Dowd [Burney], 101 West Shamrock Dr. Robinson, Texas, owns a non-participating thirty per cent interest, in the water system, which she has owned from and since it's [sic] founding on August 6, 1952. That Everett H O'Dowd is the trustee for Cornelia Ann O'Dowd [Burney], with full power to manage, operate, control, mortgage or sell said Ann O'Dowd interest providing in event of sale, thirty (30) per cent of net proceed are placed in a trust fund solely for the use and benefit of Cornelia Ann O'Dowd [Burney] and her bodily heirs. That the remaining seventy per cent is *243 owned equally by Everett H. O'Dowd and Cornelia N. O'Dowd for reason that 70% of said property is community in origin. Signed this 26 August 1964 /s/ Everett H O'Dowd
STATE OF TEXASCOUNTY OF MC LENNAN
Before me, the undersigned Authority, on this day personally appeared Everett H O'Dowd, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purpose and considerations therein expressed. August 26, 1964 /s/ H. C. Ogesbee / Notary Public In and For Mc Lennan County, Texas
For the calendar years 1961 through 1968, Robinson Water reported the following sales and net profits after salaries on its corporate Federal income tax returns: Year
Net Profit or
After Period
Sales
Salaries
1961
$34,751.44
$ (58.56)
1962
48,010.50
(74.31)
1963
51,294.90
(1,264.82)
1964
54,918.59
4,614.00
1965
52,570.78
1,827.61
1966
59,350.80
1,994.35
1967
64,732.26
5,344.49
1968
74,799.08
1,465.95 On its return for 1969, Robinson Water reported a net profit of $8,841.49 resulting from gains on excessive depreciation under sections 1245 and 1250. On these returns, *244 the following depreciable assets and balances after accumulated depreciation were shown: Balance After
Subtracting Year or
Depreciable Assets
Accumulated Period
Ending Balance
Depreciation
1961
$ 94,841.51
$ 47,838.91
1962
110,380.05
59,756.74
1963
120,671.89
66,188.89
1964
134,223.61
75,367.29
1965
138,845.10
82,544.73
1966
150,185.51
89,607.23
1967
159,244.87
98,218.02
1968
205,414.14
109,190.79
Jan. 1, 1969
205,414.14
109,190.79
The balance sheet of Robinson Water as shown on its books as of December 31, 1968, was as follows: ASSETS
CURRENT ASSETS: Cash in Bank
$ 8,008.94
Cash in Savings
30,000.00
Total Current Assets
$ 38,008.94
FIXED ASSETS: Utility Plant
220,414.14
Less: Accumulated Depreciation
109,190.79
Total Fixed Assets
111,223.35
OTHER ASSETS: Accounts Receivable - E. H. O'Dowd
28,044.69
Customer Advances for Construction
1,915.53
Total Other Assets
29,960.22
Total Assets
$179,192.51
LIABILITIES AND CAPITAL
CURRENT LIABILITIES: Payroll Taxes Payable
$ 127.99
Note Payable - Bank
3,401.11
Total Current Liabilities
$ 3,529.10
LONG-TERM LIABILITIES: Note Payable - Bank
90,771.86
OTHER LIABILITIES: Customer Deposits
11,690.00
Total Liabilities
105,990.96
Contributions in Aid of Construction
38,034.00
CAPITAL: E. H. O'Dowd, Capital, 1-1-68
33,701.60
Add: Net Income for Year
1,465.95
Total Capital
35,167.55
Total Liabilities and Capital
$179,192.51
*245 As of January 1, 1969, the Robinson Water System consisted of approximately 168,000 linear feet of water line. The pipes composing this line varied in size from 1 inch to 10 inches. Approximately 85,000 feet of the pipe consisted of one-inch and two-inch galvanized steel pipe and the balance was asbestos cement pipe. About 46 percent of the linear feet of water pipe was laid in the period from 1952 to 1955. Some of the pipe was of foreign make and did not meet the specified standard for an approved water system at the time it was laid. As of January 1, 1969, Robinson Water had five water plant sites, three of which had wells and two only storage facilities. Two of the wells were drilled in 1952 and one was drilled in 1961. There are pumps at each of the wells housed in a pump house. Four of the five storage tanks were old at the time they were acquired. These tanks were acquired from railroad companies and converted for water plant use. One tank had developed leaks about five years prior to 1969 and had been periodically patched, and another tank had been replaced on a bed of sand after almost collapsing. The one tank which was new when acquired was a 500-gallon welded, *246 steel storage tank at ground level. This tank had been built for Robinson Water in early 1968 by J. N. Construction Company of Dallas, Texas in accordance with the specifications in an agreement between the construction company and Robinson Water dated January 17, 1968. The total cost of constructing the tank was $20,000 and payment for the construction of this tank was made by check dated May 6, 1968. As of January 1, 1969, Robinson Water had 1,012 3/4-inch single meters, two 1-inch, two 1-1/2-inch, two 2-inch, one 3-inch, and one 4-inch meters.It had 39 fire hydrants, most of which had been acquired for $5 each secondhand from larger cities that were replacing these hydrants with more modern equipment. Included in the distribution system of Robinson Water were the valves and chlorination equipment necessary to operation of the system as well as the land on which each of the five water plant sites was located. The land on which each of three plants was located was approximately one-fourth acre and two of the sites were located on six one-hundredths of an acre of land. As of January 1, 1969, the water rates of Robinson Water were as follows: $3.00 for the first 1,600 gallons
*247 $0.70 per thousand gallons thereafter On September 30, 1967, Robinson Water acquired, at a cost of $12,000, 24 acres of land lying between the Robinson sewage disposal plant and the Robinson city cemetery. This land had been acquired as part of a larger site by some developers but had never been developed in any way when the developers approached Mr. O'Dowd with respect to selling the land to Robinson Water. The land was subject to occasional flooding. No development had been placed on this land as of January 1, 1969, but it remained in the state in which it had been purchased. Mr. O'Dowd, prior to January 1, 1969, had discussed with the Certified Public Accountant who prepared the returns for Robinson Water the tax effect of not incorporating the business of Robinson Water under the laws of Texas before termination of the section 1361 election. However, Mr. O'Dowd for a number of reasons did not wish to have the business of Robinson Water conducted by a Texas corporation. Mr. and Mrs. O'Dowd on their Federal income tax return for the calendar year 1969 reported a gain on the "Liquidation of Sec. 1361 Corporation Under Sec. 331 IRC - January 1, 1969" *248 in the amount of $21,094.43 which was computed as follows: Book
Fair Market
Value
Value (1)
1-1-69
1-1-69
ASSETS
Cash
38,008.94
38,008.94
Loan to Stockholder
28,044.69
28,044.69
Customer Advances
1,915.53
1,915.53
Adjusted Basis - Utility Plant
73,189.35
82,030.84
Total Assets
141,158.51
150,000.00
Assumption of Liabilities by
Everett H. & Cornelia N. O'Dowd
Notes Payable - First National Bank of Waco
94,172.97
Meter Deposits
11,690.00
Payroll Taxes Payable
127.99
105,990.96
Net Assets (Liquidating Dividend)
44,009.04
Basis of Sec. 1361 Stock
22,914.61
Reportable Gain
21,094.43
Note 1: The fair market value of the water system was determined by the number of users times $150.00. Number of users or meters
1,000
Value per Meter $150
Total Value of System
$ 150,000.00
Respondent in his notice of deficiency increased the capital gain reported by Mr. and Mrs. O'Dowd by the amount of $270,984.58 with the following explanation: It is determined that you realized a long-term capital gain of $563,063.59 upon termination of the election of the Robinson Water Company to be taxed as a corporation *249 under section 1361 of the Internal Revenue Code on January 1, 1969. Since you reported a gain of $21,094.43, your gain is increased by $541,969.16. This gain is taxable income subject to the 50 percent deduction provided by section 1202 of the Code, and the increase in the taxable income is $270,984.58. Respondent also decreased the amount of depreciation for 1969 allowable to Mr. and Mrs. O'Dowd on the water company facility with the following explanation: It is determined that the machinery and equipment of the Robinson Water Company had a depreciable basis of $154,060.61 and an estimated life of 15 years instead of a basis of $82,030.84 and a 5-year life as reported on your tax return. Therefore, the depreciation deduction of $16,406.17 reported on these assets is disallowed to the extent of $6,135.46. Mr. and Mrs. O'Dowd filed an amended tax return for the calendar year 1969 in which they decreased their reported taxable income by $10,690.92, the explanation for this decrease being, in part, as follows: Increase Item
(Decrease)
Explanation
A
[10,690.92)
Correction of gain recognized
on the liquidation of Code Sec-
tion 1361 Corporation due to an
involuntary change in the tax-
payer's (Robinson Water Company)
status solely by operation of a
change in the regulations. Ac-
cordingly, no tax consequence
by way of a constructive liqui-
dation should flow from the in-
voluntary change in classification.
To do so would cause an uncon-
scionable injury to the taxpayer.
*250 On its "Final (Sec. 1361 Corporation)" income tax return for the year 1969, Robinson Water reported a gain of $8,841.49 from disposition of depreciable assets which represented the difference in the $73,189.35 book value of the utility plant as of January 1, 1969, and the $82,030.84 fair market value of that plant as of that date as shown on its return. Respondent in his notice of deficiency to Robinson Water increased Robinson Water's gain on disposition of depreciable assets by $48,995.77 with the following explanation: Taxable income as shown in return as filed $ 8,841.49 Increases (Decreases) in income 48,995.77 (a) Section 1245 gain- It is determined that you realized ordinary income of $57,837.26 from dis- position of section 1245 assets on ter- mination of the election to be taxed as a corporation under section 1361 of the Internal Revenue Code on January 1, 1969. Since you reported income of $8,841.49 from this transaction, your taxable in- come is increased by $48,995.77.
In his answer to amended petition, respondent alleged that petitioner Robinson Water realized ordinary income of $66,363.12 on the disposition of Code section 1245 assets *251 and accordingly claimed an increased deficiency. OPINION Section 1361, providing for an irrevocable election by certain proprietorships and partnerships to be taxable as corporations, was enacted as part of the Internal Revenue Code of 1954. No comparable provision had previously been in the tax law. The section was repealed in 1966. The repealing statute included section 1361(n) which provided that the election of the unincorporated business to be taxed as a corporation might be revoked after the enactment of the repealing statute, but if a revocation of the election had not been made before December 31, 1968, the election would terminate on January 1, 1969, and the enterprise should not be considered a domestic corporation for any period on or after January 1, 1969. [2]
*252 Section 1361(a) as in effect for the years 1961 and 1962 provided that where the qualifications set forth in subsection (b) of section 1361 were met, an election might be made in accordance with regulations prescribed by the Secretary or his delegate not later than 60 days after the close of any taxable year of a proprietorship or partnership owning an unincorporated business enterprise to which the election applies by the proprietor or all the partners owning an interest in the enterprise.[3]
*253 The letter dated February 15, 1962, signed by Mr. O'Dowd was sent to the District Director of Internal Revenue within 60 days after the close of the calendar year 1961 and the statements in the letter covered the items set forth in section 1361(b), namely that Robinson Water was owned by Mr. and Mrs. O'Dowd, that no proprietor or partner has more than a 10 percent interest in another 1361 corporation, that no proprietor or partner is a nonresident alien and that the enterprise was one in which capital is a material income-producing factor. The letter also set forth an agreement to notify the District Director if a change in ownership occurred or the enterprise became a corporation. Petitioners, however, contend that the election was ineffective since the letter of election was signed only by Mr. O'Dowd and was not signed by Mrs. O'Dowd or their daughter, Cornelia, as required by section 1.1361-1(b), Income Tax Regs.[4] Petitioners point out the specific requirement of this regulation that the statement be signed by "all the partners owning a profits or capital interest in the enterprise." *254 The record here is clear that a 70 percent capital interest and the total profit interest in the enterprise were owned by Mr. and Mrs. O'Dowd as community property and that although no profit interest was owned by their daughter, Cornelia, she did own a 30 percent capital interest. It is also stipulated that Mr. O'Dowd was the trustee of his daughter's capital interest with the full power to manage, operate, control, mortgage or sell her interest.Petitioners recognize that at the time the letter was signed, which was prior to the enactment of Title I of the Texas Family Code by Acts 1969, 61st Leg., ch. 888, effective January 1, 1970. Mr. O'Dowd, as manager of the community, was responsible for the management, control and disposition of the community property and could bind his wife in matters concerning their community property. Petitioners also recognize that Mr. O'Dowd had authority as trustee of his daughter's non-participating interest to manage and control her interest. Petitioners, however, argue that the regulations require that the individual owning any type of interest in the enterprise sign the statement making the election and that, therefore, the attempted election *255 is fatally defective since it was not signed by Mrs. O'Dowd and not signed by their daughter, Cornelia Burney. We note that the statute, while providing that the election be made in accordance with the regulations prescribed by the Secretary or his delegate and be made by all partners owning an interest, does not itself make any specific requirement that each partner sign the statement making the election. This provision is contained only in the regulations. Since unquestionably Mr. O'Dowd had the authority to make the election, not only for himself but on behalf of Mrs. O'Dowd and their daughter, we must determine whether the attempted election signed only by Mr. O'Dowd was in substantial compliance with the regulations. [5]
In considering whether the attempted election was in substantial compliance *256 with the regulations, we note that there is no specific provision in section 1.1361-1(b), Income Tax Regs., requiring that in the case of ownership of the enterprise as community property both the husband and wife sign the election as there is in the regulation concerning stock of a corporation electing to be taxed under subchapter S (sections 1371-1377) which is owned as community property. [6]
*257 However, petitioners argue that the same rationale which prompted the making of the regulation with respect to an election under subchapter S is also equally applicable to an election made under section 1361. While in our view this is not necessarily the situation, we need not decide whether section 1.1361-1(b), Income Tax Regs., should be interpreted as requiring both the husband and wife to sign the election when the business is community property. We will consider this issue on the assumption that the regulation provided for Mrs. O'Dowd's signing of the election. Even though Mrs. O'Dowd testified that she never signed any document which was intended as an election that Robinson Water be taxed as a domestic corporation and never signed the Forms 1120, corporate income tax returns, of Robinson Water, the record is clear that she was aware of the fact that Robinson Water was reporting its income separately from the income which she and Mr. O'Dowd reported on their joint return. The record shows that she did most of the bookkeeping for Robinson Water and furnished the figures to the accountant from which financial statements and returns for Robinson *258 Water were prepared. The personal income tax returns which she did sign and which she testified were accurate statements aside from the present controversy of the community income that she and Mr. O'Dowd had reported in each year included Mr. O'Dowd's salary from Robinson Water. In our view the record is clear that Mrs. O'Dowd was aware of, and as between herself and her husband consented to, the election to have Robinson Water taxed as a corporation.Mr. O'Dowd explained not discussing the actual letter of election with Mrs. O'Dowd with the statement that she would not have understood it. The testimony of the O'Dowd's daughter, Mrs. Burney, shows that she knew absolutely nothing about the business affairs of Robinson Water except some vague knowledge that she owned an interest in it. From her testimony, it is clear that she relied completely on her father to manage her interest and that she had never been consulted with respect to any action taken regarding Robinson Water and had not expected to be so consulted. With the factual background which we have outlined, it is necessary that we determine whether the election which Mr. O'Dowd filed for Robinson Water to be taxed under *259 section 1361 was in substantial compliance with respondent's regulations so as to be an effective election. It is, of course, well settled that a literal compliance with the manner in which an election is to be made is not necessary if the regulations are merely directory for the purpose of contributing to the orderly and prompt conduct of business. Octavio J. Valdes,60 T.C. 910, 913 (1973). As we pointed out in the Valdes case, it is necessary to examine the purpose of a regulation as well as its relationship to other provisions of the regulations and the terms of the underlying statute to ascertain whether a particular provision of a regulation stating how an election is to be made must be literally followed. We there pointed out that as we had stated in Indiana Rolling Mills Co.,13 B.T.A. 1141, 1144 (1928), "The question of whether substantial compliance with the statute had been achieved was framed 'What is the essence of the thing required to be done by this statute?'" We have also recognized that even though the statute provides that an election *260 or revocation shall be made in such manner as the Secretary or his delegate shall prescribe by regulation, and the regulation provides for the filing of a statement by a corporation "accompanied by a statement of consent signed by each shareholder," there may be substantial compliance with the regulations even though the purported revocation is made in a return signed by the sole shareholder as the president of the corporation and not in his capacity as shareholder. Alfred N. Hoffman,47 T.C. 218, 236-237 (1966), affd. per curiam 391 F. 2d 930 (5th Cir. 1968). See also Georgie S. Cary,41 T.C. 214 (1963), and cases therein discussed. In Fred J. Sperapani,42 T.C. 308, 329 (1964), we held an election for an unincorporated business to be taxed under the provisions of section 1361 to be in substantial compliance with the regulations even though the election did not contain the specific statements as to each of the qualifications set forth in section 1361(b) being met but merely a general statement that the unincorporated enterprise *261 complies and qualifies with the regulations prescribed under section 1361. In that case the taxpayer was contending that the election was in substantial compliance with respondent's regulations and respondent was contending that since it did not literally comply with the regulations it was ineffective. We pointed out that the information shown in the statement, when considered in connection with the information shown on the corporate income tax returns filed by the business, clearly indicated that the business did meet the qualifications required by section 1361 and that respondent had in no way been prejudiced by the failure of the taxpayer to file an agreement to notify him of certain events since none of those events had occurred. In that case we stated at 332-333: Reading section 1361 as a whole and the applicable temporary regulations thereunder, we conclude that the essence of the statute is that a notice of election be filed with the district director and that such election be perfected by filing a corporation income tax return containing a statement that it is the return of a section 1361 corporation. That part of the regulation requiring that the statement of election *262 contain specific allegations of fact showing that the qualifications of section 1361(b) have been met, and an agreement to notify the district director in the event of incorporation of the enterprise or a change in ownership, relate to details of procedure and do not go to the essence of the statute. Thus they are merely directory. Inasmuch as petitioner filed a timely election and timely corporation income tax returns for Columbia for the years 1957 and 1958, all of which clearly set forth that Columbia was an unincorporated sole proprietorship electing to be taxed as a corporation pursuant to section 1361 and claiming that it was qualified to do so under the regulations, and these steps constituted the essential statutory requirements for an election, we conclude that there was a substantial compliance with the statute and temporary regulation, and that a valid election for Columbia to be taxed as a domestic corporation was made. Since Mr. O'Dowd, by virtue of the community property laws of the State of Texas, had the authority to manage Mrs. O'Dowd's community interest in Robinson Water and, because of being trustee of his daughter's interest had the authority to manage her *263 interest, an election signed by Mr. O'Dowd is under the statute an election by "the proprietor or partnership" owning Robinson Water. This action of electing under section 1361 was taken by Mr. O'Dowd in the same manner in which he handled other matters for Robinson Water and was binding on all owners because of his authority to act for the other owners. Under the facts here we conclude that the election was in substantial compliance with the regulation. Where authority exists in a husband-trustee to elect on behalf of the wife and daughter, the provision in the regulation that the statement be signed by "all partners" is merely directory.In fact, the record shows that because of his managerial control of Robinson Water, Mr. O'Dowd considered himself as the owner and sole proprietor of Robinson Water. Under the community property laws of Texas, Mr. O'Dowd was not in fact the "owner" of his wife's community property interest. He was trustee of the nonparticipating interest of his daughter and not the "owner" of that interest. However, because of his management rights over 100 percent of the interest in Robinson Water he was, from the management standpoint, the "sole proprietor." *264 Under the circumstances, and particularly considering the fact that the record shows that Mrs. O'Dowd had knowledge of the election and did not object to this use of her husband's management of her community interest in the business, we conclude that the election under section 1361 was in substantial compliance with the regulations and was therefore valid. Petitioners contend that if we conclude that Mr. O'Dowd's signature was sufficient for a valid election because of his right to manage the community property and his authority to act as trustee for his daughter, Cornelia, nevertheless the intended election for Robinson Water to be taxed as a corporation was invalid for failure to meet the requirement of section 1361(b) that the enterprise be owned by an individual or by a partnership consisting of not more than 50 individual members. Petitioners argue that the word "individual" should not be interpreted to include a trust and that since Cornelia's interest was owned by a trust the purported election was void ab initio. While the stipulated facts as well as the representation made by Mr. O'Dowd in a sworn statement in connection with filing a trade name certificate with the *265 State of Texas refer to Mr. O'Dowd as "trustee" of the nonparticipating interest of his daughter, Cornelia, it is clear that there was in fact no formal trust of Cornelia's interest. Not only is there no evidence in the record that such a trust existed but the inference from the provision that if his daughter's interest was sold the amount received would be placed into a "trust" indicates that no legal trust in fact existed with respect to the interest of Cornelia in Robinson Water. The context in which the word "trustee" is used in the stipulation and the certificate indicates that the word "trustee" is intended to denote Mr. O'Dowd's managerial power over his daughter's interest.There is nothing in this record to show that any interest in Robinson Water was owned other than by an individual. Having concluded that the election of Robinson Water to be taxed as a corporation was a valid election, it is unnecessary to consider respondent's argument with respect to estoppel. Petitioners take the position that even if the election were valid, upon the termination of the election by operation of the provision of section 1361(n)(2) (Footnote 2, supra), Mr. and Mrs. O'Dowd should *266 not be considered as having received a distribution in liquidation from a corporation.Petitioners argue that in fact and in substance there never has been any change in the operation of the water company from its inception through the date of the trial of this case. Both Mr. and Mrs. O'Dowd testified that the company had been operated in the same manner throughout its existence. Petitioners argue, in light of this fact and since the statute contains no specific provision as to the treatment to be accorded for tax purposes upon termination of the section 1361 election under sec-1361(n)(2), that section 1.1361-16(b) of the Income Tax Regs., providing that if an election under section 1361(a) would be effective on January 1, 1969 except for the provisions with respect to termination contained in section 1361(n)(2), then the section 1361 corporation and its owners shall be treated as if the corporation had distributed its assets in complete liquidation on January 1, 1969, is invalid. [7]
*267 Petitioners contend that their view is supported by the holding of the Court of Appeals for the Fifth Circuit, to which an appeal in this case would lie, in Estate of Willett v. Commissioner,365 F. 2d 760 (5th Cir. 1966), revg. a Memorandum Opinion of this Court.The Circuit Court in the Willett case held the provisions of section 1.1361-5(b)(1), Income Tax Regs., treating a legal incorporation of an unincorporated business which had elected to be subject to the provisions of section 1361 to have the effect of terminating the section 1361 election in such a manner that it amounted to a distribution of the assets of the business to its owners as if a corporate liquidation had occurred. The identical issue raised by petitioners in the instant case was considered by this Court in the very recent case of Edward J. Prescott, 66 T.C. , filed April 21, 1976. The taxpayer in the Prescott case made exactly the same argument as petitioners in the instant case are making. In the Prescott case we considered the provision of the Income Tax Regulations in light of the legislative history of section 1361(n) which was enacted *268 in connection with the repeal of the provisions of section 1361 and in light of the underlying problem to which the regulation was addressed. We quoted from the Senate Finance Committee Report discussing the repeal of section 1361, stressing the sentence which stated that: "The revocation or termination of an election (without any transfer to an actual corporation) under your committee's amendment will be treated, for Federal income tax purposes, as a complete liquidation of a corporation." S. Rept. No. 1007 to accompany H.R. 9883, p. 10, 89th Cong., 2d Sess., p. 10. We also quoted from page 22 of the Senate Report two paragraphs which contain sentences clearly indicating that upon termination of the election pursuant to section 1361(n)(2), the section 1361 corporation and its owners should be treated as if the corporation had distributed its assets in a complete liquidation on the effective date of the revocation. We concluded that section 1.1361-16 of the Regulations was valid from the clear expression of Congressional intent contained in the committee report and the fact that if the termination were not treated as a distribution of the assets received by the owners in a corporate *269 liquidation, the owners would be able to receive the accumulated earnings of the section 1361 corporation without any additional tax consequences even though in many instances those earnings would have been taxed at the lower corporate rate rather than the higher individual rate. [8]
*270 In the instant case, as we did in the Prescott case, supra, we recognize that there may be some inequities falling on petitioners from the fact that on the liquidation of Robinson Water they are in effect taxed on the appreciation in value of the business assets as well as the accumulated earnings in the business. However, this same situation occurs upon the liquidation of any wholly-owned or closely-held corporation. Furthermore, the owners take the assets upon liquidation at their fair market value and, if they continue to operate the business, should recover in depreciation over the years the value of the depreciable assets received in the liquidation. If the business is sold, the basis of the assets is, of course, determined by the value placed on the assets at the time they were distributed in liquidation. Therefore, the long range effect should not result in an inequity. Presumably, in recognition of the possible inequity, if upon a voluntary revocation of the 1361 election under section 1361(n)(1) made prior to December 31, 1968, or a revocation required under section 1361(n)(2) at January 1, 1969, the owners decided to incorporate the business under state law *271 and transfer the assets to the corporation, the liquidation could be considered as a transaction in which no loss is recognized and gain is recognized only to the extent of "other property." Section 1.1361-16, Income Tax Regs. The record in this case shows that Mr. O'Dowd was aware of the option to incorporate Robinson Water under the laws of the State of Texas and discussed the possibility with his accountant but chose not to follow that course. While we recognize that Mr. O'Dowd considered valid reasons to exist for not incorporating the business of Robinson Water, the fact remains that this alternative was available under the law and regulations. In the Edward J. Prescott case, supra, as in the instant case, the argument was made that the opinion of the Circuit Court in Estate of Willett v. Commissioner,supra, was authority for holding section 1.1361-16(b), Income Tax Regs., invalid. In the Prescott case, we pointed out that in Estate of David Wein,40 T.C. 454 (1963), we had upheld the validity of section 1.1361-5(b) of the Income Tax Regs. *272 which taxed the owners of a 1361 corporation as if they had received a distribution of the assets of the corporation in liquidation and transferred those assets to a new corporation when a corporation was formed to which the assets of the 1361 corporation were transferred, and that our holding in this case had been affirmed in Wein's Estate v. Commissioner,330 F. 2d 957 (3d Cir. 1964). We further pointed out that a comparable holding in a Memorandum Opinion of this Court had been reversed by the Fifth Circuit in Estate of Willett v. Commissioner,supra, and that the Seventh Circuit in Mathis v. United States,430 F. 2d 158 (7th Cir. 1970), had followed the holding of the Fifth Circuit as had the case of Higgins v. United States,281 F. Supp. 913 (D.C. Mass. 1968). We, however, pointed out that the situation involved in those cases differed from that in the instant case. Those cases all involved a proprietorship which had elected to be a section 1361 corporation and later actually incorporated. The theory of the regulation was that the actual incorporation terminated the 1361 election and resulted in a distribution *273 of the assets of the section 1361 corporation to its owners who then contributed those assets to the legally formed corporation. The Fifth Circuit in the Willett case concluded that no reason existed not to consider there to be no termination of the section 1361 corporation but rather its continuation as a legally chartered corporation. Further, in the Willett case it was clear that the owners of the business enterprise would gain access to the accumulated earnings of the section 1361 corporation (or its other assets) through an actual corporate distribution only from the legally constituted corporation and would be taxed at the time of such corporate distribution. In the instant case the owners of Robinson Water, as did the owners of the business involved in the Prescott case, obtained access to the corporate assets upon the termination of the 1361 election. It was the fact that the owners did not gain access to the accumulated earnings and could only gain such access through a taxable corporate distribution that was the underlying rationale of the Circuit Court in reversing the Opinion of this Court in Estate of Willett v. Commissioner,supra. *274 Because of the distinction in the situation upon an actual incorporation of the business of the section 1361 corporation and a termination of the election with the business and the assets returning unrestricted to the owners, in the Prescott case we held the opinions dealing with the regulation governing actual incorporation of a "section 1361 corporation" not to be controlling. The same factual situation is present in the instant case as in the Prescott case. In our view the Estate of Willett v. Commissioner,supra, and cases following that decision are not controlling here because of the factual distinctions in the cases and the different legal concepts involved. We conclude as we did in Edward J. Prescott,supra, that section 1.1361-16(b), Income Tax Regs., is a valid regulation and is in accordance with the provisions of the statute. We, therefore, conclude that Mr. and Mrs. O'Dowd are deemed to have received the assets of Robinson Water in a complete corporate liquidation on January 1, 1969. The parties agree that if we hold the provisions of section 1.1361-16(b), Income Tax Regs. *275 , to be valid and the O'Dowds to have received the Robinson Water assets as a distribution in a complete corporate liquidation on January 1, 1969, the amount of distribution which they received is the fair market value of the assets of Robinson Water on January 1, 1969. The parties, however, differ markedly as to the value of those assets. Respondent in his statutory notice determined the value of the assets of Robinson Water as of January 1, 1969, to be $624,000. Of this amount he determined $154,060.61 to be the value of the depreciable assets of Robinson Water. [9]
On brief, respondent argues that the fair market value of the assets of Robinson Water at the time of the distribution was $437,634.30, of which $350,539.34 was the basis of the depreciable machinery and equipment of Robinson Water. The fair market value of $437,634.30 is stated by respondent to be based on the valuation made by his expert witness, James D. Dannenbaum. *276 The valuation report prepared by this witness which was the substance of his testimony at the trial arrived at a January 1, 1969, value of the assets of Robinson Water of $409,434.30. However, the expert witness of petitioners, John Ball, had included in his valuation of the assets of Robinson Water as of January 1, 1969, in addition to the items included by respondent's witness, $28,200 of other equipment. Therefore, apparently respondent is now contending for a value which adds to the amount of fair market value determined by his expert an amount of $28,200 of other equipment. On the basis of his present contention, respondent takes the position that the O'Dowds realized a taxable gain of $414,719.69 on the termination of the section 1361 status of Robinson Water rather than the gain of $563,063.59 determined in his notice of deficiency. Petitioners had as their expert witness John Ball, who is a Professor of Engineering at Texas A&M University, a consultant for various public utilities and an appraiser in utility rate matters. Petitioners' expert arrived at a total fair market value of the assets of Robinson Water, other than land, as of January 1, 1969, of $288,300. Respondent *277 called a second expert witness, a financial analyst, who arrived at a fair market value of the assets of Robinson Water as of January 1, 1969, of $400,000. He based his conclusion on two so-called "sales" of water companies. One of these companies had substantially fewer customers than Robinson Water. It had sold its assets in 1967 for $175,000. The other so-called "sale" was actually not a sale but an offer by a company to sell a water system substantially larger than that of Robinson Water to a community which it served for $1,672,000 in 1974. Because these companies have not been shown to be comparable to Robinson Water in the quality of equipment, the age of equipment, the length of lines necessary to service customers or in any other manner, in our view these "sales" are of little value in attempting to ascertain the fair market value of Robinson Water at January 1, 1969. Mr. O'Dowd testified that considering the unorthodox nature of much of the equipment in Robinson Water, the state of repair of this equipment and the necessity in the near future for it to be replaced, in his opinion the fair market value of Robinson Water as of January 1, 1969, excluding land, was $69,029. *278 This amount substantially coincides with the approximately $82,000 shown by the O'Dowds on their 1969 return to be the fair market value of the Robinson Water physical assets at January 1, 1969. The record shows that the book value of the Robinson Water assets, excluding land, at January 1, 1969, was $96,223.35 and that the book value of the assets, including land, at January 1, 1969, was $111,223.35. Petitioners argue that we should determine a fair market value of the assets of Robinson Water not in excess of their book value. Both respondent's expert witness, James D. Dannenbaum, and petitioners' expert witness, John Ball, approach their valuation of the assets of Robinson Water by determining the construction costs of the facilities and then making allowance for depreciation. Their approach differed only in that respondent's expert used construction costs as of January 1, 1969, and adjusted back to arrive at a depreciation allowance and petitioners' expert attempted to obtain construction costs as of the time the item was actually constructed and adjusted forward for changes in construction costs and then allowed for depreciation. Both of these witnesses took the approach *279 that they have taken in hearings to have a proper rate based on asset value determined for a water company. While they recognized that the value which they arrived at was not necessarily fair market value, they were both of the opinion that the value would approach fair market value in that a purchaser would be influenced not by the actual rate of return being received by the business he was buying but by the rate he might expect to be allowed based on the value of the assets of the business. Neither expert started with the actual cost to Robinson Water for construction of the facilities. In the view of each expert the fact that Mr. O'Dowd had done much of the work himself in constructing the facilities and, therefore, perhaps obtained the facilities at a lesser price than had the facilities been installed by an outside contractor, would not affect the fair market value of the facilities. A buyer would look to his own cost to have a contractor construct the facilities. Respondent's expert did not consider the unorthodox nature of the facilities such as the use of foreign pipe and the fact that much of the equipment was used when it was put into the system to affect the fair market *280 value that he placed on the system. In his view this aspect was adequately adjusted for by his depreciation allowance. Also, respondent's expert, after arriving at the construction costs of the Robinson Water distribution, supply and storage facilities as of January 1, 1969, added 7 percent for administrative and organizational expense and 6 percent for 1 year's interest on construction cost to arrive at his total replacement cost as of January 1, 1969, from which the depreciation allowance was subtracted. Petitioners' expert made no such adjustments since in his view the construction costs he arrived at were adequately high to compensate for any administrative and interest expense. In our view, respondent's expert witness in most instances has put excessive January 1, 1969, values on the assets of Robinson Water.Two items which demonstrate this are his value of the 500-gallon water tank which Robinson Water had constructed through an outside contractor in 1968, about 8 months prior to the January 1, 1969, value date, for $20,000. Respondent's expert placed a construction cost on this facility as of January 1, 1969, of $39,000 and a value on January 1, 1969, of $44,070. He *281 gave no explanation of how he arrived at a construction cost about 8 months after the completion of the water tank by an outside contractor of nearly twice the cost to Robinson Water to have this tank built and completed by an outside contractor. His explanation was that he obtained his estimates from well-known contractors and reliable sources and he believed them to be accurate. Regardless of the sources the expert consulted, in our view if Mr. O'Dowd could obtain a contractor to build the water tank for $20,000 in the early months of 1968, any prospective buyer would be aware that he could likewise have the water tank constructed at January 1, 1969, by a contractor for substantially this price plus perhaps a small addition for the increase in construction costs between the early part of 1968 and January 1, 1969. In our view, the value that respondent's expert placed on this water tank is unrealistic under the facts of this case. Another item which was unrealistically valued by respondent's expert is the 24 acres of land which Robinson Water purchased on September 30, 1967, for $12,000. Respondent's expert valued this land on January 1, 1969, at $84,000. Respondent's expert *282 justified his valuation by speculation that perhaps Mr. O'Dowd had obtained the land at a bargain because the developer that owned it was anxious to be rid of it. However, there is nothing in the record to indicate that Robinson Water made any bargain purchase of the 24 acres of land.Apparently there was no relationship between the developer and the O'Dowds other than that of a seller with a prospective purchaser. Actually the land according to Mrs. O'Dowd's description and pictures placed in the record, though susceptible to subdivision with sufficient work, was not desirable subdivision land. In our view, the $12,000 represented the fair market price of the land when it was purchased on September 30, 1967, and its value on January 1, 1969, would be in excess of that amount only to the extent of the general increase in land prices between the two dates. We also consider respondent's expert's valuation of the fire hydrants, which had been purchased used for $5 each when they were installed by Robinson Water, to be unrealistic. In our view, the values arrived at by petitioners' expert are generally more realistic values than those determined by respondent's expert. Mr. O'Dowd *283 as the owner-operator of the water system understandably placed too great emphasis on the depressing affect on value of some of the undesirable features of the Robinson Water system. Considering the evidence as a whole, we have determined that based on this record the best available value of water meters is the value determined by respondent's expert of $39,918, and the best available values of the fire hydrants, wells, tanks, treatment equipment, pump stations and other equipment are those determined by petitioners' expert which are as follows: Fire Hydrants
$ 3,300
Wells
31,200
Tanks
40,000
Treatment Equipment
2,800
Pump Stations
15,700
Other Equipment
28,200 Petitioners' expert witness recognized that separate values should be considered for the smaller and larger pipe in petitioners' distribution system. Based on the nature, not only of the pipe but the area it served, in his view the system should properly be valued in 3 classes. Class I would consist of the portion of the system that has reasonably large diameter pipe and could be expected to be usable for an extended time in the future. Class II would be the pipe of inadequate size that would have *284 to be replaced with larger pipe even though the pipe itself was still serviceable, and Class III would have an actual useful life as compared to physical useful life substantially less than the Class I pipe. In Class III he would place the small 2-inch diameter pipe that ran for considerable distances to service very few customers. In his view the value of this pipe to the company was nominal.Apparently some of this pipe had actually been given to the company by the customers serviced but still was of little value to the company. Because of the time aspect in valuing the pipe in the manner he consiered most appropriate, petitioners' expert valued it on a construction cost basis with adjustment for depreciation recognizing that his value was probably too high. He arrived at a value of $101,700. In our view petitioners' expert is correct that this value of the pipe is too high. Mr. O'Dowd testified at some length as to why such a construction cost value of the pipe would exceed its fair market value. However, in his testimony he was unwilling to deviate from the low cost at which he felt he himself could replace this pipe. We agree with both expert witnesses that if the work accomplished *285 by Mr. O'Dowd at such a low cost was in every way comparable to much higher cost work of a contractor, the fact that he was able to do the work at substantially under the going-cost of such construction would not be determinative of the fair market value of the completed project. A purchaser would have to rely on what it would cost him with a contractor to have this construction work performed. However, considering all the evidence in the record, we concluded that a 20 percent discount on the cost of the pipe as determined by petitioners' expert is appropriate to adjust for the factors that he felt required some discount and, therefore, consider the fair market value of the pipe at January 1, 1969, to be $81,460. This brings the total value of the depreciable assets of Robinson Water as of January 1, 1969, to $242,578. In our view the value of the 24 acres of land would be the $12,000 paid for the land plus the percentage of that figure that land prices in general in the area had increased. From the record as a whole, we determine the value of this land at January 1, 1969, to be $13,000. The only values we have as of January 1, 1969, for the land on which the pump stations are *286 located are the values determined by respondent's expert. Three pieces of this land consisted of approximately one-fourth acre each and two pieces of six one-hundredths of an acre each. The total January 1, 1969, value placed on this land by respondent's expert was $3,095 and for lack of any other basis for determining its value, we accept this valuation. This makes a total value of the Robinson Water assets as of January 1, 1969, of $258,673. In our view no addition needs to be made to this valuation for any administrative or interest adjustments since the values as determined include such items. It follows from our determination of the fair market value of the depreciable assets as of January 1, 1969, that the basis of the Robinson Water depreciable assets to the O'Dowds in 1969 was $242,578. There is no evidence to show error in respondent's determination that the useful life of these assets in 1969 was 15 years. Therefore, a proper depreciation deduction for the year 1969 on the Robinson Water assets may be computed under Rule 155. Also the amount of gain of Robinson Water in 1969 from disposition of section 1245 assets is merely a matter of computation and may be determined *287 in the recomputation under Rule 155. Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. SEC. 1361(n).--Revocation and Termination of Elections.-- (1) Revocation.--An election under subsection (a) with respect to an unincorporated business enterprise may be revoked after the date of the enactment of this subsection by the proprietor of such enterprise or by all the partners owning an interest in such enterprise on the date on which the revocation is made. Such enterprise shall not be considered a domestic corporation for any period on or after the effective date of such revocation. A revocation under this paragraph shall be made in such manner as the Secretary or his delegate may prescribe by regulations. (2) Termination.--If a revocation under paragraph (1) of an election under subsection (a) with respect to any unincorporated business enterprise is not effective on or before December 31, 1968, such election shall terminate on January 1, 1969, and such enterprise shall not be considered a domestic corporation for any period on or after January 1, 1969.↩
3. SEC. 1361. UNINCORPORATED BUSINESS ENTERPRISES ELECTING TO BE TAXED AS DOMESTIC CORPORATIONS. (a) General Rule.--Subject to the qualifications in subsection (b), an election may be made, in accordance with regulations prescribed by the Secretary or his delegate, not later than 60 days after the close of any taxable year of a proprietorship or partnership owning an unincorporated business enterprise, by the proprietor or all the partners, owning an interest in such enterprise at any time on or after the first day of the first taxable year to which the election applies or of the year described in subsection (f), to be subject to the taxes described in subsection (h) as a domestic corporation for such year and subsequent years. No election (other than an election referred to in subsection (f)) may be made under this subsection after the date of enactment of this sentence. (b) Qualifications.--The election described in subsection (a) may not be made with respect to an unincorporated business enterprise unless at all times during the period on or after the first day of the first taxable year to which the election applies or of the year described in subsection (f), as the case may be, and on or before the date of election-- (1) such enterprise is owned by an individual, or by a partnership consisting of not more than 50 individual members; (2) no proprietor or partner having more than a 10 percent interest in profits or capital of such enterprise is a proprietor or a partner having more than a 10 percent interest in profits or capital of any other unincorporated business enterprise taxable as a domestic corporation; (3) no proprietor or partner of such enterprise is a nonresident alien or a foreign partnership; and (4) such enterprise is one in which capital is a material income producing factor, or 50 percent or more of the gross income of such enterprise consists of gains, profits, or income derived from trading as a principal or from buying and selling real property, stock, securities, or commodities for the account of others.↩
4. Sec. 1.1361-1(b) [Income Tax Regs.] Manner of making election. The election under section 1361 shall be made by filing a statement that the proprietor or partners, as the case may be, elect under section 1361 to have the enterprise treated as a domestic corporation. The statement shall be filed with the district director with whom the enterprise would be required to file its income tax return if it were an actual corporation. See section 6091(b)(2).The statement shall be filed during the first 60 days after the close of the first taxable year of the proprietor or partnership to which the election is applicable. The statement shall give sufficient information to establish that the enterprise meets the qualifications set forth in section 1361(b) and sec. 1.1361-2. It shall also contain an agreement by the proprietor or partners to notify the district director with whom the statement is filed in the event a change of ownership occurs (as described in paragraph (a)(2) of sec. 1.1361-6), or if the owners cease conducting the business of the enterprise in an unincorporated form. The statement shall be signed by the proprietor of, or all the partners owning a profits or capital interest in, the enterprise at any time during the period beginning on the first day of the first taxable year to which the election applies and ending on the day on which the election is filed. A proprietor or partner having an interest in the enterprise at any time during the first taxable year with respect to which the election applies is required to sign the statement even though he held no such interest at the end of such year or at the time the election is filed. A proprietor or partner who acquired his interest after the end of the first taxable year to which the election applies but prior to the date the election is filed is also required to assent to the election by signing the statement even though he held no interest at any time during the first taxable year to which the election applies.If in a year subsequent to the first taxable year with respect to which the election applies a change of ownership occurs (as described in paragraph (a)(2) of sec. 1.1361-6) which under the provisions of section 1361(f) causes the enterprise no longer to be considered a section 1361↩ corporation unless a new election is made, such new election shall be made under the provisions of this paragraph in the same manner as an original election.
5. Petitioners in their reply brief argue that perhaps Mr. O'Dowd would, by electing for Robinson Water to be taxed as a corporation, be attempting to bind Mrs. O'Dowd's separate property. Since it is stipulated that the ownership in Robinson Water was community property and only this property was involved in the election we do not consider this argument to be of substance.↩
6. Section 1.1371-1(d)(2)(i), Income Tax Regs., provides that: (2) Stock owned by husband and wife. (i) Except as otherwise provided in this paragraph, in determining whether a corporation meets the 10-or-fewer-shareholders requirement of section 1371(a)(1), stock which-- (a) Is community property of a husband and wife (or the income from which is community income) under the applicable community-property law of a State, or (b) Is held by a husband and wife as joint tenants, tenants by the entirety, or tenants in common, shall be treated as owned by one shareholder.For this purpose, if a husband or wife owns stock in a corporation individually, and the husband and wife own other stock in the corporation jointly, the husband and wife will be considered one shareholder. However, if the husband and wife each owns stock in the corporation individually, they will be treated as two shareholders. This subdivision applies only in determining the number of shareholders for purposes of section 1371(a)(1) and does not apply for purposes of any other provisions of subchapter S, chapter 1 of the Code. Thus, for example, the husband and wife will each be considered a shareholder for purposes of section 1372(a), relating to the requirement that all shareholders consent to the corporation's election, * * *. This provision was added to the regulation by T.D. 6432, 1960-1 C.B. 317. This T.D. superseded T.D. 6317, 1958-2 C.B. 1096, which had carried no such provision. On September 23, 1959, Congress had added subsection (c) to sec. 1371 which provided that for the purpose of determining whether a corporation had more than 10 shareholders, stock owned by a husband and wife as community property should be treated as owned by one shareholder. (Sec. 2(a), P.L. 86-376, 73 Stat. 699) After this regulation became effective, Congress on May 4, 1961, added subsection (g) to sec. 1372 which provided that where stock was owned as community property, if either spouse had filed a timely consent to an election under sec. 1371(a)↩ for a taxable year beginning before January 1, 1961, the time for filing the consent of the other spouse to such election should not expire prior to May 15, 1961. (Sec. 2, P.L. 87-29, 75 Stat. 64-65)
7. Sec. 1.1361-16 [Income Tax Regs.] Revocation and termination of elections. (b) Termination of all elections on January 1, 1969. If any election under section 1361(a) with respect to an unincorporated business enterprise would be effective on January 1, 1969, without regard to paragraph (2) of section 1361(n) and the provisions of this paragraph, such election shall terminate on January 1, 1969. The section 1361 corporation and its owners shall be treated as if the corporation had distributed its assets in a complete liquidation on January 1, 1969. The effect of the liquidation on the owners shall be determined under the provisions of sections 331 and 334(a)↩. (However, a liquidation which is followed by a transfer to another corporation of all or part of the assets of the liquidating corporation or which is preceded by such a transfer may have the effect of the distribution of a dividend or of a transaction in which no loss is recognized and gain is recognized only to the extent of "other property." See sections 301 and 356.) The provisions of paragraph (c)(1) of sec. 1.1361-11 are not applicable to a business enterprise with respect to which an election has been terminated under this paragraph. The requirements of section 6043 (relating to information returns) and paragraph (d) of sec. 1.331-1 (relating to returns of shareholders) must be complied with.
8. Petitioners in this case offered in evidence a recomputation of the taxes of Mr. and Mrs. O'Dowd for the years 1961 through 1968 by a Certified Public Accountant which added to their reported income the income of Robinson Water. This computation showed that there had actually been no tax saving to the O'Dowds by having the income of the water company taxed at corporate rates rather than included in their individual income but in fact over the entire period of years the total tax paid by the O'Dowds and Robinson Water as a corporation was higher than the tax would have been had Robinson Water's profits been included in the O'Dowd's income. While some question exists as to the method used in reaching the comparative tax amounts, if we accepted petitioners' position that no tax saving resulted to the O'Dowds by having the profits of Robinson Water taxed as corporate profits, our opinion as to the validity of respondent's regulation would not be affected by the happenstance result in this one case. As we pointed out in Edward J. Prescott, 66 T.C. , filed April 21, 1976, one of the problems sought to be avoided by the regulations, both sec. 1.1361-15(b) and sec. 1.1361-16(b), Income Tax Regs., "arises when income is accumulated in a sec. 1361↩ corporation at corporate tax rates (which presumably would be lower than the individual rates otherwise applicable or else no election would be filed)." The validity of the regulation cannot be influenced by the actual factual situation with respect to a particular taxpayer.
9. Respondent's determination was based on the report of an engineer agent who determined the fair market value as follows: ↩
Adjusted Basis Utility Plant
$154,060.61
Land
15,000.00
Going Business
454,939.39
Total
$624,000.00